1
2
3
4
5
6
7

8          **UNITED STATES DISTRICT COURT**

9          **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 8:12-CR-00090-JLS |
| Plaintiff, | **ORDER DENYING MOTIONS TO VACATE, SET ASIDE OR CORRECT FEDERAL SENTENCE (DOCS. 728, 745, 772)** |
| v. | |
| CRAIG SHULTS, et al., | |
| Defendants. | **ORDER DENYING CERTIFICATE OF APPEALABILITY** |
| CRAIG SHULTS, | Case No. 8:19-CV-000587-JLS |
| Petitioner, | **ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT FEDERAL SENTENCE** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | **ORDER DENYING CERTIFICATE OF APPEALABILITY** |
| JOSEPH HAYMORE, | Case No. 8:19-CV-00361-JLS |
| Petitioner, | **ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT FEDERAL SENTENCE (DOC. 1)** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | **ORDER DENYING CERTIFICATE OF APPEALABILITY** |
| PAUL LICAUSI, | Case No. 8:19-CV-00416-JLS |
| Petitioner, | **ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT FEDERAL SENTENCE (DOC. 1)** |
| v. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | **ORDER DENYING CERTIFICATE OF APPEALABILITY** |

| | |
|---|---|
| SYLVIA MELKONIAN,<br><br>              Petitioner,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br>              Respondent. | Case No.  8:19-CV-02095-JLS<br><br>**ORDER DENYING MOTION TO VACATE, SET ASIDE OR CORRECT FEDERAL SENTENCE (DOC. 1)**<br><br>**ORDER DENYING CERTIFICATE OF APPEALABILITY** |

## I.    INTRODUCTION

Petitioners Craig Shults, Joseph Haymore, Paul LiCausi, and Sylvia Melkonian (at times, collectively, "Petitioners") were all convicted after a jury trial in the underlying criminal case, 8:12-cr-00090-JLS.  Judge Andrew Guilford presided over the case and the trial until he recused himself on March 14, 2019, at which time the criminal case was assigned to Judge Staton.  Presently before the Court are Petitioners' Motions to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255.[1]  Petitioners argue their trial counsel were ineffective because, at the close of the evidence, they failed to renew their motions to sever Petitioners' trials.  As set forth below, the Court concludes they did not suffer prejudice.  Accordingly, the Court DENIES Petitioners' Motions.

## II.   BACKGROUND

### A.    Procedural History

#### 1.    Indictment

The charges against Petitioners may be summarized as follows.  Petitioners, along with co-defendants Sheridan Snyder and Andrew Wardein,[2] were each charged with up to ten counts of wire fraud in connection with the sale of bank-owned homes to investors.  (*See generally* CR Doc. 1, Indictment.)  The charges include reference to

---

[1] Herein, the Court cites to docket entries in the criminal case as "CR Doc." and, where necessary, the Court cites to each individual civil case by the Petitioner's name, *e.g.*, "Haymore Doc."  The matters are fully briefed.  (*See* Haymore Docs. 1 (Motion), 11 (Opp.), 14 (Reply); LiCausi Docs. 1 (Motion), 13 (Opp.), 16 (Reply); Shults Docs. 1 (Motion), 9 (Opp.), 15 (Reply); Melkonian Docs. 1 (Motion), 4 (Ex.), 9 (Opp.).)

[2] Defendant Snyder pleaded guilty to Count 3 of the Indictment.  (CR Doc. 94).  Defendant Wardein was acquitted on all counts.  (CR Doc. 400 (sealed).)

several unindicted entities.  For instance, Petitioners Haymore and LiCausi were affiliated with unindicted entities United Capital Group, LLC and United Capital Fund, LLC (collectively, "UC").  (*Id.* at 2.)  Shults was affiliated with unindicted entity Creative Realty Solutions, LLC ("CRS").  (*Id.* at 3-4.)

The Indictment outlines the scheme to defraud and charges multiple counts of wire fraud in furtherance of that scheme.  Specifically, the Indictment alleges a scheme whereby Petitioners, from July 2009 through July 2010, purported to sell real property to investors who were solicited through seminars and webinars.  (*Id.* at 3-4.) Defendant Shults would make representations to investors regarding the condition of the properties, the expected rental income, and property management.  (*Id.* at 4-5.) During some seminars, Defendant Shults used a PowerPoint presentation provided by Haymore that contained similar representations.  (*Id.* at 5-6.)

The misrepresentations charged in the Indictment include:  Investors were promised delivery of the "clean and marketable title" to their properties within 15 days of payment; they were told the properties would be habitable, lien-free, and eligible for FHA-financing; they were led to believe that the properties could be sold for $60,000 or more after one year; and they were promised a guaranteed $600 a month rent for three months.  (*Id.* at 6-7.)  Investors were directed to wire transfer purchase money in escrow accounts, but investor funds were improperly disbursed to Defendants prior to closing.  (*Id.*)  The counts submitted to the jury[3] involved wire transfers of funds made to and from entities affiliated with Petitioners (Counts 1, 3, 6, and 8-10) and an email to an investor attaching a sales agreement (Count 2).  The Indictment charged that 37 investors were defrauded out of more than $4.2 million. (*Id.* at 7.)

---

[3] Although the Indictment charged ten counts of wire fraud, only seven counts were submitted to the jury because Counts 4, 5, and 7 were dismissed on the Government's motion and were therefore not submitted to the jury.  (CR Docs. 316, 354.)

### 2.     Pretrial Motions

On January 14, 2013, well before trial, Haymore moved to sever his case from co-defendants Shults, Snyder, Wardein, and Melkonian; LiCausi joined in this motion on March 20, 2013.  The matter was briefed extensively.  (CR Docs. 71-73, 78, 80-81 89, 93).  At the hearing on the matter on June 3, 2013, Haymore's counsel argued that Haymore's and LiCausi's defense theory was antagonistic to Shults's because Haymore and LiCausi maintained that they simply gave Shults a generic PowerPoint presentation and that it was Shults and his associates (co-Defendants Melkonian and Wardein) who modified it to include the misrepresentations underlying the fraud charges.  (CR Doc. 623, June 3, 3013 Tr. at 7.)  The Court denied the motion to sever without prejudice, noting that "additional facts" could cause the Court to alter its ruling.  (*Id.* at 30.)

On June 7, 2013, Shults filed a motion to continue trial; the trial court held a hearing on June 13, 2013.   (CR Docs. 96 (Motion), 549 (June 13, 2013 Tr.)  At the hearing, the issue of severing Haymore and LiCausi for trial was again discussed. (*See, e.g.*, *id.* at 9-10.)  On June 14, 2013, Shults filed a supplement to his motion to continue the trial.  (CR Doc. 102.)  In his supplement, Shults requested that the Court grant Haymore's and LiCausi's severance motion and continue Shults's trial.  On June 18, 2013, the trial court granted Shults' motion to continue the trial, but did not sever any Defendant(s), reiterating that Haymore's and LiCausi's severance motions were denied without prejudice.  (CR Doc. 104.)

On July 29, 2013, Haymore again moved to sever, and LiCausi again joined in the motion.  (*See* CR Docs. 135, 143-144.)  The motion was heard on August 12, 2013.  (CR Doc. 593, Aug. 12, 2013 Tr.)  The trial court again denied the motion, and again did so without prejudice.  (*Id.* at 23 ("Again, any pending motions to sever are denied.  I'll add, without prejudice.  We'll see what happens along the way."); CR Doc. 158.)

### 3. Trial

Trial commenced January 7, 2014. (CR Doc. 253.) As detailed below, Defendants' trial strategies included inconsistent defenses. Before the Government's case-in-chief, the court instructed the jury that it must give separate consideration of the evidence as to each defendant. (*See* CR Doc. 552, Jan. 9, 2014 Tr. at 84 (giving Model Instruction 1.13 of the Ninth Circuit Model Criminal Jury Instructions).) After the close of evidence, the court reiterated this instruction, giving Model Instruction 3.13, relating the separate consideration of multiple counts and multiple defendants. (*See* CR Doc. 626, Feb. 12, 2014 Tr. at 32-33.)

### 4. Verdict

After over twenty days of voir dire and trial, and three to four days of deliberation, jurors found Shults, Haymore, and LiCausi guilty on all counts, and found Melkonian guilty as to Counts 8, 9, and 10 only, acquitting her as to Counts 1, 2, 3, and 6. (CR Doc. 400, Verdict Form.) Wardein was acquitted on all counts. (*Id.*)

### 5. Motion for New Trial

When LiCausi moved for a new trial, Haymore joined, and the two again argued their joinder for trial with their co-defendants was prejudicial. (CR Docs. 376, 377 at 5-7.) The trial court denied the motion for a new trial. (CR Doc. 399.) In doing so, the court acknowledged Defendants' argument that their defense was inconsistent with the defense presented by Defendant Shults. (CR Doc. 399 at 6). Nevertheless, the court held that the relevant standard was not met. (*Id.* at 6-7.) Specifically, the court stated:

> But antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant is insufficient to require severance. To demonstrate that competing defenses amounted to manifest prejudice in a joint trial, a defendant must show the core of the codefendant's defense is so irreconcilable with the core of his own

1   defense that the acceptance of the co-defendant's theory by the jury

2   precludes acquittal of the defendant.

3   *Id.* (internal alteration marks and quotation marks omitted).

### 6.   Appeals and Petitions for Certiorari

5   Petitioners appealed, arguing, *inter alia*, that the trial court erred in denying

6   their motions to sever.  The Ninth Circuit consolidated Petitioners' appeals.  (*See*

7   *United States v. Shults, et al.*, Case. No. 14-50515 (9th Cir.).)  On April 6, 2018, the

8   Ninth Circuit affirmed.  (CR. Doc. 689 ("Ninth Cir. Op.").)  The Ninth Circuit

9   declined to reach the merits of their severance argument, determining Petitioners

10  waived their severance argument by failing to renew the motion at the close of

11  evidence.  (*Id.* at 2-3 (relying on *United States v. Decoud*, 456 F.3d 996 (9th Cir.

12  2006)).)  Under *Decoud*, the failure to renew a motion to sever waives the issue unless

13  he or she "diligently pursued severance" or where "renewing the motion would have

14  been an unnecessary formality."  *Id.* at 1008.  Here, the Ninth Circuit observed that

15  the trial court denied the pretrial motion to sever without prejudice, expressly stating

16  that the court would consider a renewed motion to sever where additional facts arose

17  that might support it.  (Ninth Cir. Opp. at 2-3.)  In light of this, the *Decoud* standard

18  was not met.  (*Id.*)

19  The Petitioners' request for rehearing en banc was denied.  (*Shults*, 14-50515

20  (9th Cir.) Doc. 107.)  Haymore's and LiCausi's petitions for certiorari were also

21  denied.  (*Haymore*, 14-50536 (9th Cir.) Doc. 109; *United States v. LiCausi*, Case No.

22  14-50545 (9th Cir.) Doc. 101.)  The present § 2255 motions followed.

### B.   Inconsistent Defenses at Trial

24  Although Petitioners shared the common defense that parties not before the

25  court were responsible for any wrongdoing, Petitioners' defenses were clearly

26  inconsistent on a number of points.  Generally, Haymore and LiCausi's defenses were

27  aligned, but were inconsistent with Shults' defense.  The inconsistencies were

28  revealed in opening statements and continued through closing arguments.  Much of

the divergence centered on a PowerPoint file that Shults used in soliciting investors, which Shults contended was provided by Haymore and LiCausi (through UC) and which Haymore and LiCausi contended was altered by Shults to include the misrepresentations that are significant to the offenses of conviction.

### 1.    Opening Statements

In his opening statement, Haymore's counsel told the jury that they would hear evidence that Haymore heard from investors that the seminars conducted by Shults included Shults' representations about UC buying back certain properties for $60,000. (CR Doc. 552, Jan. 9, 2014 Tr. at 37.)   In response to these reports, Haymore contacted Shults to ask why the investors thought that.  (*Id.* at 37-38 ("Craig, we're seeing multiple e-mails and multiple buyers telling Sherry and Mark the same thing. They aren't saying this unless you're telling them that in seminars. We've never agreed to buy back homes. We're not buying homes back. That's not our deal.").)

Shults' counsel countered by blaming Haymore and LiCausi.  (*Id.* at 49 ("[T]he evidence will establish that what Mr. Shults said to investors is what he was recommended be . . . said in a PowerPoint that was forwarded to him by UCF.") Shults' job, according to his counsel, was to make presentations based on the PowerPoint and, when he did so, Haymore and LiCausi "told him he was doing a great job."  (*Id.* at 49-50; *see also id.* at 56 ("It was UCF that had devised this PowerPoint.  It is UCF that prepared the contract.")

### 2.    Government's Case-in-Chief

The Government called a number of victims of the scheme as witnesses, and Haymore's defense counsel's cross-examination of at least four of them tended to shift blame to Shults and to minimize Haymore's role.  (*See* CR Doc. 557, Jan. 21, 2014 Tr. at 48-50 (testimony of Timothy Wallander agreeing that Shults gave the impression he was in charge of the investment program); *id.* at 134 (same witness agreeing that unlike Shults, Haymore did not make any promises to him); *id.* at 258-59 (testimony of Donna Reynal agreeing she relied on Shults' presentation); CR Doc.

571, Jan. 24, 2014 Tr. at 47 (testimony of Donald Long, agreeing that it appeared that Shults came up with investment program); *id.* at 56 (same witness testifying that Shults never stated that Haymore, LiCausi, or UC were involved in investment program); *id.* at 61 (same witness understood Shults was connected with CRS and managed hedge funds valued at over $9 billion, which gave him comfort that he could make good on promise to buy back properties); CR Doc. 572, Jan 28, 2014 Tr. at 197-98 (witness Omar Ally testified that he understood that Shults or TCS or CRS purchased the property from UC and would improve distressed properties to make it ready for investment); *id.* at 203-04 (same witness testifying that the written contract did not match Shults' oral representations); *id.* at 215 (same witness testifying that Shults did not keep any of the promises he had made to the witness ("Zero kept promises.")).)

Shults' counsel used his cross-examination of these witnesses to minimize Shults' involvement and establish that certain points regarding investment "exit strategies" that were made at the seminar were similar to information found on UC's website. (Jan. 24, 2014 Tr. at 6, 15-18 (testimony of Donald Long agreeing regarding the similarities).) He also elicited testimony regarding Haymore's control over the investment program. (Jan. 28, 2014 Tr. at 161-62 (according to witness Omar Ally, co-Defendant Sherry Snyder told him that "Haymore had tight-fisted control [and] was running everything," but she did not tell the witness the same thing about Shults).)

When co-Defendant Snyder testified on direct (and on cross) that she disbursed funds from escrow at the direction of Haymore and that she otherwise followed Haymore's instructions, which favored Shults, Haymore sought to impeach her credibility. (*Compare* CR Doc. 554, Jan. 15, 2014 Tr. at 58 (Snyder testifying on direct that Haymore instructed her when to disburse funds, to whom, and in what amount) *and id.* at 214-17 (Snyder testifying on cross by Shults' counsel that Shults was entitled to $3,000 commission upon sale, that he was not kept in the loop

regarding whether clear title had been obtained because he had no responsibility regarding title status, that Haymore (not Shults) hired Snyder, and that Snyder needed direction from Haymore before she could send Shults his commission) *with* CR Doc. 555, Jan. 16, 2014 Tr. at 40-42 (upon cross examination by Haymore's counsel, witness admitting being "less than forthright" in a deposition and during her FBI interview).

### 3.    Defense Cases-in-Chief

In presenting their defenses, Haymore and Shults each undercut the other's defenses.  For example, Shults offered the testimony of a witness who told the jury that Shults was trying to remedy problems with the properties brought to his attention by unhappy investors, but that there were no similar "efforts by Mr. Haymore or by people at United Capital."  (*See* CR Doc. 577, Feb. 5, 2014 Tr. at 189-91 (witness Jeff Miller).)  With another witness, Shults again emphasized that the PowerPoint used by Shults came from Haymore.  (CR Doc. 578, Feb. 6, 2014 Tr. at 21-22 (witness Manuel Ramirez).)  This same witness testified that CRS and TCS would be responsible for finding renters for the property, and UC would be responsible for inspections and repairs.  (*Id.* at 33-34.)

Haymore questioned one of his former employees, eliciting testimony that undercut Shults' defense.  Witness Corey Cooper directly contradicted Ramirez's testimony by testifying that CRS was responsible for making property repairs.  (*See* CR Doc. 579, Feb. 7, 2014 Tr. at 178-79.)  He also testified that UC did not ever represent that the properties were FHA-approved and that UC did not ever agree to buy back the properties for $60,000.  (*Id.* at 198.)

### 4.    Closing Arguments

In its closing argument, the Government noted that Petitioners were blaming each other:  "[T]hey're all pointing the fingers at each other, and Shults seems to be pointing the—the defense team on that side is pointing over to Mr. Haymore.  Mr. Haymore's side is pointing back at Mr. Shults."  (CR Doc. 626, Feb. 12, 2014 Tr. at

85.)  But the Government also noted that the finger pointing didn't make sense because Petitioners continued to do business with each other.  (*Id.* ("[I]f they really thought the other one wronged them, what are they doing still conducting transactions with each other in March of 2010?").)

Shults's counsel portrayed him as a mere salesperson who lacked any intent to defraud.  He told the jury that Shults' representations to the investors came "from the people at United Capital," that is, Haymore and LiCausi.  (Feb. 12, 2014 Tr. at 109 ("[T]he evidence in this case . . . shows that he relied in good faith on materials and advice and counseling from the people at United Capital.").)  On this point, counsel acknowledged his "royal battle" with Haymore's defense counsel.  (*Id.* at 119.)  Counsel for Shults pointed out that the PowerPoint was prepared by UC, sent to him, and that the substance of the PowerPoint incorporated information from UC's website.  (*See id.* at 121-22.)  Counsel also told the jury that although Shults made a number of promises to investors, his representations were premised upon the materials provided to him by UC, and others hired by UC were responsible for not delivering on those promises.  (*Id.* at 122.)

Haymore's counsel blamed Shults.  He argued that "Shults was out there saying things that he shouldn't be saying."  (*Id.* at 175.)  He argued that Haymore (and UC) fulfilled its promises but that Shults made promises he couldn't keep, he blamed others, he invested no money, and although he was given $19,000 to spend in rehabilitation on the properties, he did not use it for that purpose.  (CR Doc. 628, Feb. 13, 2014 Tr. at 19.)

LiCausi's counsel also blamed Shults.  He told the jury that the "deceit" in the transactions "came from that man, Mr. Shults."  (*Id.* at 125.)  He argued that "Mr. Shults did what he did to get the money."  (*Id.*)  LiCausi's counsel characterized the charged scheme as a "business dispute" that involved Shults cheating LiCausi and Haymore:

1    Well, it's a business dispute between Mr. LiCausi and Mr. Haymore at

2    UCF and Mr. Shults. What Mr. Shults tried to do was take the extra

3    10,000 or 20,000 that he should for rehab and put it in his pocket so that

4    he could go ahead and cheat people, including us.

5  *Id.* at 127.

6    ## C.    Failure to Renew Motion to Sever

7        Despite the antagonistic defenses that continued throughout the trial, at the

8  close of evidence, no defense counsel renewed the motion to sever Petitioners for trial.

9  This failure was not strategic.  Defense counsel—all six of them— were simply

10  unaware that this renewal was required.  (*See* Haymore Doc. 1-2, Huish Decl. ¶¶ 5-8

11  (representing Haymore), *id.* Doc. 1-3, Smith Decl. ¶¶ 5-8 (same), *id.* Doc. 1-4,

12  Rudnick Decl. ¶¶ 5-8 (representing LiCausi), *id.* Doc. 1-5 Gleason Decl. ¶¶ 5-8

13  (same); Shults Doc. 4, Riddet Decl. ¶¶ 25-27 (representing Shults); Melkonian Doc. 4,

14  Robison Decl. ¶¶ 14-15 (representing Melkonian).)

15        However, as noted above, Petitioners Haymore and LiCausi moved for a new

16  trial, including moving on the basis that Petitioners should have been severed for trial,

17  and the trial court denied the motion.  The Ninth Circuit affirmed the denial of the

18  motion for a new trial, but held that by failing to renew the motion to sever,

19  Petitioners waived the severance argument.

20        Because of this failure, all four Petitioners have moved pursuant to § 2255 to

21  vacate, set aside, or correct their sentences based on ineffective assistance of counsel

22  in violation of their Sixth Amendment Right to Counsel.[4]  (*See* Haymore Doc. 1 at 5;

23  LiCausi Doc. 1 at 5; Melkonian Doc. 1 at 5; Shults Doc. 1 at 5.)

---

[4] Petitioner Shults did not move to sever, and the Government argues that he cannot challenge his sentence on this basis.  (Shults Doc. 9, Opp. at 7-8.)  This is true of Petitioner Melkonian as well. (Melkonian Doc. 9, Opp. at 2.)  Because the Court concludes that the issue of lack of prejudice is dispositive, the Court does not consider the Government's alternative arguments regarding Shults and Melkonian.

### III.   *STRICKLAND* INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence."  28 U.S.C. § 2255(a).  The Sixth Amendment guarantees the effective assistance of counsel at all critical stages of the proceedings.  *See Strickland v. Washington*, 466 U.S. 668, 686 (1984) ("[T]he right to counsel is the right to the effective assistance of counsel.") (internal quotation marks omitted); *Iowa v. Tovar*, 541 U.S. 77, 80-81 (2004) ("The Sixth Amendment safeguards to an accused who faces incarceration the right to counsel at all critical stages of the criminal process.").

To establish ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced his or her defense.  *Strickland*, 466 U.S. at 687-96; *see also Rompilla v. Beard*, 545 U.S. 374, 380 (2005) ("Ineffective assistance under *Strickland* is deficient performance by counsel resulting in prejudice, . . . with performance being measured against an objective standard of reasonableness under prevailing professional norms . . . .") (internal quotation marks omitted).  "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect."  *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

To establish deficient performance, a petitioner must show that, in light of all the circumstances, counsel's performance was "outside the wide range of professionally competent assistance."  *Strickland*, 466 U.S. at 690.  "Judicial scrutiny of counsel's performance must be highly deferential," and must be evaluated from counsel's perspective at the time of the challenged conduct rather than with the benefit of hindsight.  *Id.* at 689.  Counsel's conduct must be "reasonable[] under prevailing

professional norms." *Id.* at 688; *accord Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). Due to the difficulties inherent in making this evaluation, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. A petitioner for post-conviction relief "must overcome [this] presumption." *Id.* (internal quotation marks omitted).

To establish prejudice during trial, a petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Stated otherwise, to prove prejudice, a petitioner must show more than "the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Courts are concerned with whether "the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 696. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

## IV.   COUNSELS' PERFORMANCE WAS DEFICIENT

Counsel's performance in failing to renew the motion to sever was deficient.

An appellate court reviews a denial of a severance motion for abuse of discretion. *United States v. Sullivan*, 522 F.3d 967, 981 (9th Cir. 2008). This is a deferential standard, and an abuse of discretion is found only where a "joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *Id.* (internal quotation marks omitted). Moreover, if the trial court "attempted to cure any risk of prejudice with proper limiting instructions, a defendant must also show that the curative instructions were inadequate." *United States v. Johnson*, 297 F.3d 845, 855 (9th Cir. 2002).

Petitioners' pretrial motions to sever are not at issue because those were affirmed. (*See* Ninth Cir. Op. at 3 n.1.) Instead, at issue is counsels' failure to renew the motion to sever at the close of evidence.

"It is well-settled that the motion to sever must be renewed at the close of evidence or it is waived." *Sullivan*, 522 F.3d at 981 (internal quotation marks omitted).[5]  However, two exceptions apply, and the renewal requirement is excused where the defendant "can show either that he diligently pursued severance or that renewing the motion would have been an unnecessary formality." *Decoud*, 456 F.3d at 1008.  Here, relying on *Decoud*, the Ninth Circuit held that Petitioners here did not establish either exception in light of the trial court's denial without prejudice and its express statements that presentation of additional facts could warrant reconsideration. (*See* Ninth Cir. Op. at 2-3.)

As noted above, all six defense counsel have signed declarations stating that their failure to renew the motion to sever was neither a tactical decision nor based on any other principled reason.  Instead, they uniformly state they were unaware of the requirement that they move to renew their motion for severance at the close of evidence.  Based on the case law cited above, the failure to do so in this instance constitutes deficient performance.

The Government argues that the conclusion that counsel's performance was deficient is not warranted.  (*See, e.g.*, Haymore Doc. 11, Opp. at 22.)  First, the Government points out that if six experienced defense counsel overlooked this point of law, perhaps knowledge of the renewal requirement is not within "prevailing professional norms."  (Haymore Opp. at 22 (quoting *Strickland*, 466 U.S. at 688).)  Second, the Government explains that Petitioners' declarations are not consistent with their initial filings before the Ninth Circuit.  (*Id.* at 22-23 (noting that it was only upon the filing of their petition for rehearing en banc that counsel disclosed that the failure to renew the motion to sever was an oversight.)  Finally, the Government argues that

---

[5] This has been the law of the Ninth Circuit for almost sixty years, originating at least as early as 1962.  *Sullivan* cites *United States v Restrepo*, 930 F.2d 705, 711 (9th Cir. 1991).  *Restrepo* relies on *United States v. Figueroa-Paz*, 468 F.2d 1055, 1057 (9th Cir. 1972), which cites *Williamson v. United States*, 310 F.2d 192, 197 n.17 (9th Cir. 1962).  *Williamson* relies on an Eighth Circuit case from 1953, *Finnegan v. United States*, 204 F.2d 105, 109 (8th Cir. 1953).

this particular omission does not render counsel's performance deficient in light of the other numerous actions on behalf of Petitioners.  (*Id.* at 23-24.)

These arguments are unavailing.  First, the fact that all six counsel overlooked this requirement does not detract from the fact that it is a requirement under binding Ninth Circuit case law, and has been for decades.  *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*.").

Second, the fact that defense counsel did not in their initial filings disclose their oversight does not detract from the finding that counsel's performance was deficient.  Indeed, it is difficult to discern how disclosure of this oversight on appeal would have assisted Petitioners.  The record before the appellate court would have still revealed that no renewal of the motion to sever occurred.  On this record, it is understandable that, having made this mistake, counsel tried to control the damage by arguing that the renewal requirement should not be enforced based on the circumstances of the case.  (*See* Haymore Doc. 14, Reply at 14-15.)

The Government's final argument must be rejected because even where defense counsel mounts an otherwise vigorous and competent defense, a single error, if prejudicial, may constitute deficient performance of counsel.  *See Murray v. Carrier*, 477 U.S. 478, 496 (1986).

Hence, the Court can determine whether Petitioners have shown ineffective assistance of counsel only by analyzing whether prejudice resulted.

## V.   NO PREJUDICE RESULTED FROM COUNSEL'S DEFICIENT PERFORMANCE

Given the procedural history in this case, to show prejudice within the meaning of *Strickland*—i.e., to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different," *Strickland*, 466 U.S. at 694—Petitioners must show that had they renewed the motion to sever at

the close of evidence, the trial judge's denial of the renewed motion[6] would have constituted an abuse of discretion.  Explained below, the Court concludes that Petitioners were appropriately joined for trial; therefore, the denial of a renewed motion to sever would not have been an abuse of discretion, and Petitioners suffered no prejudice.

To warrant severance of defendants for trial, "[a]ntagonism between defenses is insufficient; the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive."  *United States v. Sherlock*, 962 F.2d 1349, 1363 (9th Cir. 1989).  "Prejudice will exist if the jury is unable to assess the guilt or innocence of each defendant on an individual and independent basis."  *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991).  Thus, "the touchstone of the court's [severance] analysis is the effect of joinder on the ability of the jury to render a fair and honest verdict." *Id.*  To show that the antagonism between co-defendants' defenses "amounted to manifest prejudice in a joint trial, a defendant must show the core of the co-defendant's defense was so irreconcilable with the core of his own defense that the acceptance of the co-defendant's theory by a jury precludes acquittal of the defendant."  *Johnson*, 297 F.3d at 858 (internal quotation marks omitted).  In other words, "*the need for severance turns on the degree of conflict*[.]"  *United States v. Pena-Lora*, 225 F.3d 17, 34 (1st Cir. 2000) (emphasis in original).  "The mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating the other does not generate the kind of prejudice that mandates severance."  *Sherlock*, 962 at 1363.

However, prejudice requiring severance may be found where evidence is admitted in a joint trial that would be *inadmissible* in a separate trial.  *Zafiro v. United States*, 506 U.S. 534, 539 (1993) ("Evidence that is probative of a defendant's guilt but technically admissible only against a codefendant also might present a risk of

---

[6] For purposes of the present motions, because the trial court denied the motion for a new trial on this basis, the Court presumes that had the motion to sever been renewed, it would have been denied.

16

prejudice.").  But even then, the Supreme Court has declined to adopt a bright-line rule that mandates severance in all such cases; instead, the Court has noted that appropriate limiting instructions may cure any potential prejudice.  *Id.* at 537-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

In trying to meet the standard for establishing prejudicial joinder, Petitioners focus on Shults' attempt to portray himself as a mere salesman and on Shults' cross-examination of certain witnesses for the prosecution.  But despite these differences, Petitioners were united in the defense that none of them were guilty, and that the only guilty parties were not before the court for trial.

For example, in opening statement, although Haymore's counsel pointed to Shults as the source for the alleged misrepresentation that UC would buy back certain properties for $60,000, Haymore's counsel more directly focused his opening statement on the guilt of two other participants, for example, by directly accusing Defendant Snyder, who had pleaded guilty prior to trial, of wrongdoing.  (CR Doc. 625, Jan. 8, 2014 Tr. at 193 ("[I]n this case you're going to find two gatekeepers; two of them, who are supposed to protect these investors that bought properties from CRS. Two of them. One pled guilty because she is a crook.  And one the Government decided not to bring in.").)  According to Haymore's counsel, as to the funds diverted from escrow, Snyder, the escrow agent, was a "crook" who ignored her "gatekeeper" function.  (*Id.*; CR Doc. 552, Jan. 9, 2014 Tr. at 34 ("She stole a lot of money and these investors got hurt.  And she's the number one gatekeeper.").)  And according to Haymore's counsel, as to the failure to make promised repairs to the properties, the other "gatekeeper," the unindicted property-management company, was to blame.  (*Id.* ("There is another gatekeeper and that other gatekeeper was the management company[,] BSP . . . .").)  Far from directly accusing Shults, Haymore's counsel stated that "CRS . . . wanted to fix the homes and do their job."  (*Id.* at 35.)  Haymore's counsel told the jury that the principal of BSP was "desperate for money," and that he

stole almost all of the money set aside by CRS to make repairs to the properties before he "ran." (*Id.* at 35-36 ("Mark Sanders took all the money.").) Haymore's counsel finished by emphasizing that the guilty parties were not before the court for trial. (*Id.* at 41 ("You will hear that Sherry Snyder took the funds. She did not guard the gate. You'll hear that Brook-Sloan, the management company, did not guard the funds. You'll hear this would not have happened had it not been for those two.").) Similarly, LiCausi's counsel maintained that no crimes had been committed. (*Id.* at 67 ("All I can tell you is that there's no fraud scheme, as the evidence will show in this case.").)

Like Haymore and LiCausi, Shults blamed the two absent parties. Shults' counsel explained that the escrow agent "had the job of securing title," but "[t]he titles were a mess," and "[s]he did not do what she was supposed to." (*Id.* at 56.) Shults' counsel observed "she has appropriately pleaded guilty in this case." (*Id.*) And like Haymore's counsel, Shults' counsel cast blame on the property management company regarding the condition of the properties: "[BSP was], therefore, responsible for using those funds to inspect, rehab, get renters, that kind of thing. Mr. Sanders' company completely failed to do that, and they have not been charged in this case, even though the evidence will suggest that they had a specific role." (*Id.* at 46.) Indeed, far from focusing Shults' defense on implicating his co-defendants, Shults' counsel expressly stated: "In fact, I think the evidence in this case will probably show that no one that is sitting here in this courtroom is guilty of any criminal conduct." (*Id.* at 44.)

Petitioners' closing arguments continued on this theme. Haymore's counsel referred to the escrow agent as a "forger, a liar, and a thief." (CR Doc. 626, Feb. 12, 2014 Tr. at 185.) And according to Haymore's counsel, ultimately, "[h]ad Sherry Snyder and Brook-Sloane done their job[s], we wouldn't be standing here." (CR Doc. 628, Feb. 13, 2014 Tr. at 19.)

Shults' closing argument echoed this same theme. Shults' counsel stated "[T]here's no fraud in this case by anyone." (CR Doc. 626, Feb. 12, 2014 Tr. at 115.) He again stated that the escrow agent was to blame for the failure to provide title, and

he again stated that the property management company took the money intended to repair the properties and "did nothing." (*Id.* at 115-16.)  Counsel stated:  "This program fell apart because of two people.  Sherry Snyder and Mark Sanders." (*Id.* at 117.)

This common defense establishes that Petitioners' defenses were not mutually exclusive.  Because Petitioners' defenses were not mutually exclusive, and because they were instead in large part united in the defense of blaming the absent escrow agent and property manager, they fail to meet the standard for establishing prejudice.

This case stands in stark contrast to *Tootick*.  There, defendants Tootick and Frank were convicted in a joint trial of stabbing Hart.  *Tootick*, 952 F.2d at 1080.  Each defendant claimed the other defendant had stabbed Hart and that he was innocent.  *Id.* at 1081.  Therefore, each of the co-defendants' defenses "contradicted the other in such a way that the acquittal of one necessitate[d] the conviction of the other," *id.*, and "the jury could not . . . assess the guilt or innocence of the defendants on an individual and independent basis," *id.* at 1083.

Here, the jury could have accepted Petitioners' shared defense that the escrow agent and the property manager were responsible for any fraud perpetrated upon the investors.  Had the jury done so, it could have returned a verdict acquitting all Petitioners on all counts.  In this manner, Petitioners' defenses were not "antagonistic to the point of being irreconcilable and mutually exclusive." *Sherlock*, 962 F.2d at 1363.

Similarly, in the presence of this shared defense, Petitioners' related argument that the co-defendants became co-prosecutors becomes unpersuasive.  *See Sherlock*, 962 F.2d at 1363 ("The primary danger that the rule [requiring severance based on irreconcilable defenses] seeks to avoid is a defendant faced with two prosecutors—the government and his codefendant.").  In *Sherlock*, the Ninth Circuit found that the codefendants' "defenses focused on the failure of the government to prove guilt and emphasized the inconsistent stories given by the alleged victims and witnesses," and

that certain "isolated attacks" did not create the type of prejudice that required separate trials. *Id.* at 1363. The same is true here. Petitioners were united in their attempt to shift blame to absent parties, and other attempts to inculpate their co-defendants were insufficient to require severance. *Cf. United States v. Mayfield*, 189 F.3d 895, 899-900 (9th Cir. 1999) (finding a "second prosecutor" and a "mutually exclusive defense" where co-defendant's counsel "used every opportunity to introduce impermissible evidence against [the co-defendant], and [focused] her closing argument . . . on convincing the jury that [the co-defendant] was the guilty party, not her client.").

Moreover, Petitioners did not face a key situation described in *Zafiro* as raising the risk of prejudice. This is not a case where evidence that would otherwise be inadmissible against Petitioners was admitted solely because it was admissible against a codefendant. Petitioners Haymore and LiCausi make a related argument, contending that because of the joint trial, additional evidence was admitted that would not have been admitted in a separate trial. But Petitioners' argument is not that such evidence would have been *inadmissible* in a separate trial; rather, they argue that in a separate trial, counsel for the Government would have chosen to forego offering that evidence. (*See* Haymore Mot. at 14-15 (testimony of Witnesses Gmeiner and Call, whom the Government had agreed not to call as Haymore and LiCausi); *id.* at 16 (emails and property damage reports that both Shults and the Government sought to have admitted over the objection of Haymore and LiCausi); *id.* (evidence that was potentially inadmissible hearsay as proffered by Shults but which was potentially admissible as an admission of party-opponent when proffered by the Government).) That the Government's case against Haymore and LiCausi was stronger as a result of admission of this evidence is not the type of prejudice that requires severance. "[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540.

Nor is this a case involving impermissible prejudicial spillover. (*Cf.* Haymore Mot. at 11-12.) As noted above, the trial court instructed the jury—both before and after the evidence phase of the trial—regarding the need to separately consider the evidence against each defendant and as to each count. These limiting instructions led to a split verdict, where three Petitioners were found guilty on all charges, one Petitioner was found guilty of only three of the seven counts charged against her, and one jointly tried co-defendant was found not guilty on all counts. This split verdict demonstrates that the jury understood and followed these limiting instructions. *See United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993) (in a 12-defendant case, noting that the jury's split verdict demonstrated the jury's ability to understand and follow the court's instruction to consider the evidence separately as to each defendant), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053 (9th Cir. 2000); *see also Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

Accordingly, Petitioners were appropriately joined for trial. Had the trial court denied a renewed motion to sever at the close of trial, the Ninth Circuit would have had no basis upon which to conclude that the denial was an abuse of discretion. Therefore, Petitioners suffered no prejudice as a result of counsels' failure to renew the motions to sever at the close of evidence.

## VI.   CERTIFICATES OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2255 Proceedings requires the district court to issue or deny a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) when a final order adverse to a petitioner is entered. A certificate of appealability may be issued only when the petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). As set forth herein, no Petitioner has made any showing of the denial of a constitutional right. Accordingly, the Court DENIES the issuance of certificates of appealability.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In addition to Rule 11(a), each Petitioner is directed to Federal Rule of Appellate Procedure 4(a), which sets forth time limitations for the filing of an appeal, and to Federal Rule of Appellate Procedure 22, which relates to Certificates of Appealability.

## VII.  CONCLUSION

The Court DENIES Petitioners' § 2255 Motions.  Certificates of Appealability are DENIED in these cases.

**IT IS SO ORDERED.**

**DATED: November 4, 2020**



_____
Hon. Josephine L. Staton
United States District Judge